**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TOWN OF EAST HAVEN,<br>*Plaintiff*,<br><br>v.<br><br>ALLIED WORLD INSURANCE COMPANY, *et al*,<br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>) | 3:21-CV-01004 (SVN)<br><br><br><br><br><br>September 25, 2026 |

**ORDER ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT**

Sarala V. Nagala, United States District Judge.

In this insurance dispute, Plaintiff Town of East Haven ("the Town") seeks a declaratory judgment against its insurers, Defendants Allied World Insurance Company and Allied World National Assurance Company (together, "Allied World"), and Starr Indemnity and Liability Company ("Starr"), regarding coverage for a civil judgment obtained against the Town and its former officials, Joseph Maturo and Christopher Soto.[1] The Town was a Defendant in a lawsuit asserting constitutional violations in relation to the shutdown of a quarry located in East Haven. After both insurance companies denied the Town's request to defend it in the underlying lawsuit, the Town instituted the present action, which was then stayed in 2023 pending the resolution of the underlying litigation. The underlying plaintiffs—the quarry owner and associated entities—prevailed in a bench trial before the undersigned. The Town appealed the judgment, but in February of 2025, the parties settled the underlying action before the appeal was resolved.

The operative facts are not in dispute, and all parties have now moved for summary judgment. Plaintiff asserts that that the events giving rise to its liability in the underlying lawsuit

[1] The Town indemnified its officials, Maturo and Soto, for their liability, and the officials were covered by the Town's insurance policies with both Starr and Allied World. *See* Allied World Mot. for Summ. J., ECF No. 142-14 at 128–29; Starr Mot. for Summ. J., ECF No. 146-6 at 8. Thus, for the purposes of this dispute, the Court refers to the interests of these three parties collectively as "the Town."

fall within the coverage scope of one of its two insurance policies. Each Defendant insurer takes the position that its policy does not cover Plaintiff's losses. For the reasons described below, the Court agrees with Defendants. Thus, Defendants' motions for summary judgment, ECF Nos. 142 and 146, are GRANTED, and Plaintiff's motions for summary judgment, ECF Nos. 144 and 145, are DENIED.

## I. FACTUAL BACKGROUND

### A. The *One Barberry* Lawsuit

The Court assumes the parties' familiarity with the underlying dispute, including the resolution of motions for summary judgment on September 27, 2021, *One Barberry Real Est. Holding, LLC v. Maturo* ("*One Barberry* Summ. J."), No. 3:17-CV-00985 (KAD), 2021 WL 4430599 (D. Conn. Sept. 27, 2021) and the judgment after trial dated October 3, 2023, *One Barberry Real Est. Holding, LLC v. Maturo* ("*One Barberry*"), 698 F. Supp. 3d 252 (D. Conn. 2023). It repeats only the facts most relevant to the resolution of the present cross-motions for summary judgment.

The plaintiffs in the underlying action (the "Underlying Plaintiffs") were John Patton and the entities One Barberry Real Estate Holding, LLC and Farm River Rock LLC ("Farm River Rock"). Together, the Underlying Plaintiffs owned and operated a quarry in East Haven, Connecticut. *Id.* at 264. On June 15, 2017, the Underlying Plaintiffs filed two lawsuits in state court against the Town of East Haven and its officials: Joseph Maturo, Jr., then-mayor of the Town; Christopher Soto, then employed as the Town's Zoning Enforcement Officer; and Michael Milici, then employed as the Town's tax assessor (collectively, the "Underlying Defendants"). East

Haven L.R. 56(a)1 St., ECF No. 144-2 ¶¶ 17–18. These suits were removed to federal court on August 16, 2017, and consolidated. *Id.* ¶¶ 17–19.[2]

In brief, the Underlying Plaintiffs alleged that the Town interfered with the quarry's operations through various regulatory measures before eventually shutting it down through a series of cease-and-desist orders in May of 2017. The Town's actions, as described in the complaint, included reclassifying portions of the quarry as industrial land and taxing it at a higher rate than previously beginning in October 2015; informing Patton that blasting permits would not be granted in the months preceding the 2015 municipal election; and issuing three cease-and-desist orders between February and May 2017, the last of which instructed the Underlying Plaintiffs to completely shut down their quarry operations. *One Barberry*, 629 F. Supp. 3d at 270–295. The Underlying Plaintiffs' claims centered on whether the conduct of the Underlying Defendants violated their federal constitutional rights and Connecticut constitutional and common law rights. *See* ECF No. 144-2 ¶¶ 21–22. The Second Amended Complaint asserted thirteen claims as to the individual Underlying Defendants, and three claims as to the Town. *See One Barberry* Summ. J.,

[2] Because the relevant facts are undisputed, the Court references primarily the Town's Local Rule 56(a)1 Statement attached to its motion for summary judgment against Allied World, ECF No. 144-2, supplemented as necessary with additional information from the Local Rule 56(a)2 Statements and Statements of Additional Facts filed by Allied World and Starr.

2021 WL 4430599, at *7.[3] That complaint sought damages in excess of $25 million. *See* Case No. 17-CV-985 (SVN), ECF No. 93 at 18.

The Court (Dooley, J.) denied the Underlying Defendants' motions for summary judgment as to the substantive due process and Takings Clause claims, the claim asserted pursuant to Article First, § 11 of the Connecticut Constitution, and the municipal estoppel claim, permitting them to proceed to trial. *One Barberry* Summ. J., 2021 WL 4430599, at *26. Summary judgment was granted as to all other claims, which were dismissed from the suit. *Id.*

After evaluating the evidence presented over thirteen days at a bench trial and making lengthy factual findings, the undersigned determined that "Maturo, Soto, and the Town infringed on Plaintiffs' constitutionally protected property right in an arbitrary and irrational manner, in violation of the Fourteenth Amendment's substantive due process protections, and that these Defendants [were] liable for their conduct under 28 U.S.C. § 1983." *One Barberry*, 698 F. Supp. 3d at 265. The Court awarded $9,465,832 in compensatory damages to Plaintiff Farm River Rock. *Id.* In light of this holding, the Court found Plaintiffs' Takings Clause and inverse condemnation

[3] In ruling on cross-motions for summary judgment, the Court described the claims asserted in the Second Amended Complaint as follows: "Plaintiffs assert claims against the Town in their Second Amended Complaint (ECF No. 94) pursuant to 42 U.S.C. § 1983 for violations of the Constitution's Commerce Clause and Bill of Attainder Clause, and of Plaintiffs' rights guaranteed by the First, Fifth, and Fourteenth Amendments (Count One), a claim for taking by inverse condemnation under Article First, § 11 of the Connecticut Constitution (Count Two), and a claim sounding in municipal estoppel (Count Three). Plaintiffs assert the same constitutional claims against the Individual Defendants in the operative Second Amended Complaint (ECF No. 93) pursuant to Section 1983 (Count One), as well as claims against the Individual Defendants for: conspiracy to interfere with civil rights pursuant to Section 1985 (Count Two); civil conspiracy (Count Three); intentional, willful and malicious conduct (Count Four); prima facie tort liability for intended consequences (Count Five); prima facie tort liability for intentional harm to property interests (Count Six); statutory theft in violation of Conn. Gen. Stat. § 52-564 (Count Seven); conversion (Count Eight); intentional interference with contractual relationships (Count Nine); intentional interference with prospective business relationships (Count Ten); violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.* (Count Eleven); injunctive relief (Count Twelve); and a claim sounding in slander of title against Milici (Count Thirteen). Plaintiffs have clarified in their opposition memorandum that they are not pursuing Counts Two, Eleven, and Twelve, and summary judgment is accordingly granted to the Individual Defendants as to these claims. (*See* Pls.' Mem. at 40 n.21, ECF No. 117.)." *One Barberry* Summ. J., 2021 WL 4430599, at *7 (D. Conn. Sept. 27, 2021). The Court noted that, in addition to abandoning Counts Two, Eleven, and Twelve asserted against the Individual Defendants, it understood Plaintiffs to have abandoned their claims under the Commerce Clause, Bill of Attainder Clause, and the Equal Protection Clause. *See id.* at 7 n.14, 14.

claims to be moot and declined to reach their municipal estoppel claim. *Id.* at 329. It further found that Milici was not liable for slander of title under Connecticut common law. *Id.* at 333–334. The Court later added prejudgment interest to the compensatory damages award, bringing the total judgment to $10,691,178. Amended J., Case No. 17-CV-985 (SVN), ECF No. 341.

B. <u>The Town's Insurance Policies and Disputes with Insurers</u>

During the time period relevant to this dispute, the Town had two different liability insurers. First, between July 1, 2015, and July 1, 2016, the Town was insured by Starr. Starr issued the Town a "Special Excess Liability for Public Entities Policy" for the policy period running from July 1, 2015, to July 1, 2016 (the "Starr Policy"). ECF No. 144-2 ¶¶ 5–6. The Starr Policy's Declarations provided for a Policy Limit for its coverage, including for "wrongful acts," totaling $4,000,000, subject to a Retained Limit in the amount of $1,000,000 per "Occurrence." *Id.* ¶¶ 7–8.

Second, between July 1, 2016, and July 1, 2021, the Town was insured by Allied World. Allied World Insurance Company issued to the Town a "Public Entity Liability Package Policy" for the policy period of July 1, 2016, to July 1, 2017, which provided for a policy limit of $1,000,000 per "Each Occurrence," subject to a Retained Limit in the amount of $1,000,000. *Id.* ¶ 10. Allied World National Assurance Company issued to the Town a "Following Form Excess Liability Insurance Policy" for the same policy period, up to a policy limit of $3,000,000 per occurrence in excess over the Public Entity Liability Package Policy. *Id.* ¶ 13; Allied World L.R. 56(a)1 St., ECF No. 142-1 ¶ 32. The Town later renewed both of these policies (together, the "Allied World policies") for consecutive policy periods dating from July 1, 2017, through July 1, 2021. ECF No. 144-2 ¶¶ 11, 14. These renewed policies were identical to the original policies in all material respects. *Id.*

On June 24, 2017, the Town notified Allied World of the underlying lawsuit. Allied World L.R. 56(a)2 St., ECF No. 147-1 ¶ 24. The Town sought defense of the claims advanced and indemnity for damages sought. *Id*. In multiple communications, including those dated October 4, 2017, July 23, 2020, August 21, 2020, September 14, 2020, June 3, 2021, and October 10, 2023, Allied World disclaimed or denied coverage. *Id.* ¶ 25.

The Town notified Starr of the underlying lawsuit on February 6, 2020. Starr Add'l Mat. Facts, ECF No. 149-1 ¶ 26. The Town sought defense of the claims advanced and indemnity for damages sought. ECF No. 144-2 ¶ 26. In multiple communications, including those dated February 24, 2020, July 20, 2020, August 21, 2020, June 23, 2021, and October 20, 2023, Starr disclaimed or denied coverage. *Id.* ¶ 28.

Both Allied World and Starr referenced two primary bases for their disclaimers: (1) that the self-insured retention had not been satisfied, relieving the carriers of defense obligations, and (2) the timing of the "occurrence" fell outside of its coverage, and into the other carrier's coverage. *Id.* ¶ 28; *see also* ECF Nos. 147-1 ¶ 28 and 149-1 at ¶ 29 (indicating that Allied World and Starr also cited other policy provisions, exclusions and limitations to coverage in their disclaimer letters).

The *One Barberry* Lawsuit was defended through trial by the Town through its retained counsel without the assistance of either insurance carrier. ECF No. 144-2 ¶ 36. The day after judgment was entered, on October 5, 2023, counsel for the Town sent another demand to both Allied World and Starr for each company to accept its duty to indemnify the Town. *Id.* ¶ 48. Neither insurer agreed to the Town's demands. *Id.* ¶ 50. Allied World informed the Town of its position that the first "event, act, error or omission" relevant to its coverage obligations "took place

in September and October of 2015," prior to the July 1, 2016, policy inception date. *Id.* ¶ 51.[4] Counsel for Allied World also stated its position that Starr owed coverage relating to the *One Barberry* suit. ECF No. 144-2 ¶ 51. Starr, in turn, informed the Town of its position that "[t]he Court's Decision in the underlying action conclusively establishes that any relevant acts or resulting damages at issue began on May 9, 2017 -- the date the third and final cease-and-desist/stop work [] order was issued." *Id.* ¶ 52. In other words, Starr claimed that Allied World owed the Town coverage under the Allied World policies.

The underlying litigation continued after entry of judgment. The Underlying Plaintiffs moved to alter the judgment and were granted prejudgment interest in May of 2024. *Id.* ¶ 53. The Underlying Plaintiffs then sought attorneys' fees and costs. *Id.* ¶ 54. Prior to the Court's ruling on the attorneys' fees motion, the Town filed a notice of appeal to the U.S. Court of Appeals for the Second Circuit. *Id.* On February 24, 2025, while the appeal was pending, the action was settled for $11,000,000. *Id.* ¶ 58. It appears undisputed that the Town's defense costs in the underlying lawsuit were less than $1,000,000 prior to entry of judgment and thus defense costs, alone, did not trigger the self-insured retention amount under either policy. *See* ECF No. 147-1 ¶ 58 ("[The Town] had not exhausted the retained limit of the Allied World Policies until the payment of the settlement funding"); Allied World Mem. In Supp. of Summ. J., ECF No. 142-2 at 43–44. The Town's overall liability through the settlement far exceeded both insurers' policy limits. *See* ECF No. 144-2 ¶ 58. The Town made payment on behalf of the Underlying Defendants in satisfaction of the judgment and the parties' settlement agreement. *Id.* ¶ 61.

To date, both Allied World and Starr deny any duty to defend or duty to indemnify the Town in connection with the *One Barberry* lawsuit on the grounds that there is no coverage

[4] Allied World maintains that, while this language is accurately quoted, it is an "incomplete account of the policy provisions, exclusions and limitations" referenced in Allied World's letter. ECF No. 147-1 ¶ 51.

available to the Town under their respective policies for the claims asserted in the underlying action. *See* ECF No. 147-1 ¶ 62; ECF No. 149-1 ¶ 63.

C. The Present Action

The Town brought the current action against Allied World and Starr on July 22, 2021, seeking declaratory judgment that Starr and Allied World each have an obligation to defend and indemnify it in relation to the *One Barberry* litigation, judgment and settlement. *See* Compl., ECF No. 1. In June of 2023, the Court stayed and administratively closed the case, on the grounds that the disposition of the *One Barberry* action would significantly impact the merits of the insurance coverage claims at issue here. *See* Order, ECF No. 93. On April 4, 2025, the case was reopened and the administrative stay vacated. *See* Order, ECF No. 116. The Town filed an amended complaint on May 5, 2025, omitting the claims for declaratory judgment and instead asserting one count of breach of contract as to each insurer. *See* Am. Compl., ECF No. 131. The Town asserts that each insurer has violated both the duty to defend and the duty to indemnify. *See id.* ¶¶ 88–111. Cross-motions for summary judgment followed in October of 2025. *See* Allied World Mot. for Summ. J., ECF No. 142; East Haven Mot. for Summ. J. against Allied World, ECF No. 144; East Haven Mot. for Summ. J. against Starr, ECF No. 145; Starr Mot. for Summ. J., ECF No. 146.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there

is no genuine issue as to any material fact." *Miner v. Glens Falls,* 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted).

Because the "[c]onstruction of a contract of insurance presents a question of law for the court," *Hansen v. Ohio Cas. Ins. Co.,* 239 Conn. 537, 543 (1996), summary judgment is an appropriate vehicle by which to determine whether an insurer owes an insured a duty to defend or indemnify on the basis of an insurance policy, if the policy language is unambiguous. *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006). In determining a policy's coverage, a court construes the terms of an insurance policy "according to the general rules of contract construction. The determinative question is the intent of the parties . . . as disclosed by the provisions of the policy." *Hermitage Ins. Co. v. Sportsmen's Athletic Club,* 578 F. Supp. 2d 399, 402 (D. Conn. 2008) (quoting *Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 405–06 (D. Conn. 2002)).

## III. DISCUSSION

### A. Relevant Policy Language and Summary of the Parties' Arguments

#### *1. Allied World Policies*

The Allied World policies, effective July 1, 2016, to July 1, 2017, and renewed annually thereafter until July 1, 2021, created two relevant obligations running from Allied World to the Town, as established in the "Coverages" section of the Public Official's Liability Retained Limit Occurrence Coverage Form.

First, under the "Insuring Agreement" provision, Allied World agreed to pay, on behalf of the Town, "those sums in excess of the 'retained limit' that the [Town] becomes legally obligated to pay as a 'loss' from an 'occurrence' resulting in a 'public official's wrongful act' to which this insurance applies." Allied World Policies, ECF No. 142-14 at 121. Allied World's policy defines an "occurrence" as "an event, including continuous or repeated exposure to substantially the same generally harmful conditions," *id.* at 139, and deems an "entire 'occurrence'" as having taken place

"on the date of the first event, act, error, or omission," *id.* at 121. In relevant part, the policy defines a "public official's wrongful act" as "any actual or alleged" "error or omission, neglect or breach of duty by an insured," or a "[v]iolation of civil rights protected under 42 U.S.C. § 1981 *et seq.*" *Id.* at 140. Allied World's obligation to pay applies only if "[t]he 'public official's wrongful act' results from an 'occurrence' that commenced during the 'policy period.'" *Id.* at 121.

Second, under the "Defense Provisions" provision, Allied World agreed to defend the Town against any claim or suit seeking loss for a public official's wrongful act to which the policy applied "only when the 'retained limit' has been exhausted because of judgments, settlements and 'loss adjustment expenses' paid by the insured to a third party." *Id.* at 122.

These coverage obligations are limited by various "Exclusions," which render the insurance inapplicable to "loss" or "loss adjustment expenses" for certain types of "claim[s]" or "suit[s]." *Id.* at 123–27.

In relevant part, as identified by Allied World, the Exclusions include:

- Exclusion 10, titled "Eminent Domain or Inverse Condemnation," which excludes loss for suits "arising out of or resulting from deprivation, destruction or controlling of property by any means, method or proceeding that involves or is any way related to the principles of eminent domain, inverse condemnation, adverse possession, right of prescription, dedication by adverse use, lack of due process, or by whatever name used or however characterized; or the resulting diminution of property value."

- Exclusion 13, titled "Fraudulent or Dishonest Acts," which excludes loss for suits "arising out of . . . or in any way involving, directly or indirectly, fraudulent or dishonest acts or omissions of an insured, or bad faith on the part of an insured" if an adverse judgment "will establish that acts of active or deliberate fraud or dishonesty committed by such insured were material to the cause of action so adjudicated."

- Exclusion 25, titled "Prior Notice; Pending or Prior Legal Action," which excludes loss for suits "arising out of . . . or in any way directly or indirectly related to any fact, circumstance, event, situation, or 'public official's wrongful act' that was the subject of any . . . prior or pending legal action or litigation, administrative or regulatory proceeding . . . brought against any insured before the Effective Date of this policy."

*See* ECF No. 142-2 at 17–18 (quoting ECF No. 142-14 at 124–127).

*2. Starr Policy*

The Town's insurance policy with Starr, which was in effect from July 1, 2015, to July 1, 2016, likewise created two relevant obligations running from Starr to the Town, as established in the "Coverages" section of the Special Excess Liability Policy for Public Entities.

First, Starr agreed that it would pay on behalf of the insured "sums in excess of the retained limit that the insured becomes legally obligated to pay as damages to compensate others for loss arising out of [the insured's] wrongful act to which this insurance applies and that takes place during the Policy Period." Starr Policy, ECF No. 146-6 at 5. Under the Starr policy, a "wrongful act" is "[a]ny actual or alleged error or misstatement, omission, negligent act, or breach of duty including misfeasance, malfeasance, and nonfeasance." ECF No. 146-6 at 17–18. "All wrongful acts arising out of continuous, repeated, or related wrongful acts shall be treated as a single wrongful act" and the policy limits "in effect at the time of the first wrongful act shall apply." *Id.* at 10.[5]

Second, Starr agreed to "defend the insured against any claim or suit seeking damages" for wrongful acts "when the retained limit has been exhausted by payment to a third party of judgments, settlements or defense costs." ECF No. 146-6 at 6.

Starr, like Allied World, points to several "Exclusions" limiting its coverage obligations, which include:

- Exclusion G, which provides that the "insurance does not apply to any liability arising out of criminal, fraudulent, dishonest or malicious acts or omissions committed by or at the direction of the insured."

[5] Starr's excess casualty claims manager, the person with authority to make decisions regarding coverage, agreed at his deposition that "because the policy defines a "series of continuous, repeated or related" wrongful acts as a singular wrongful act, if the first in the series of wrongful acts occurs within the Starr policy period, but continues past the expiration of the policy, all of the wrongful acts of the series could be considered part of the initial wrongful act that constitutes the covered claim. *See* ECF No. 148 at 7 (citing ECF No. 145-10 at 80).

- Exclusion H, which provides that the "insurance does not apply to any liability arising out of your wrongful act for gain, profit, or advantage to which you are not legally entitled."

- Exclusion K, which provides that the "insurance does not apply to any liability for injunctions, equitable relief, or any other form of relief other than the payment of money damages."

- Exclusion L, which provides that the "insurance does not apply to any liability arising out of the direct condemnation of property or exercise of power of eminent domain by you or on your behalf, or inverse condemnation, or the taking of any property by you which is compensable under the Fifth or Fourteenth Amendments to the United States Constitution, or the taking of any property by you which is compensable under law of the State in which the claim or suit is made."

Starr Memo In Supp. of Summ. J., ECF No. 146-1 at 30–31, 36 (citing ECF No. 146-6 at 20–21).

*3. Summary of the Parties' Arguments*

The Town takes the position that—depending on the Court's finding as to when the relevant events occurred—either Starr or Allied World breached its duty to indemnify the Town for losses related to the Town's liability and its duty to defend the Town in the underlying lawsuit. East Haven Memo In Supp. of Summ. J. Against Allied World, ECF No. 144-1 at 4; East Haven Memo In Supp. of Summ. J. Against Starr, ECF No. 145-1 at 4. Each insurer argues that the Town's liability is predicated on actions falling outside its own policy period, but that policy exclusions preclude coverage for the Town's liability regardless. ECF No. 142-2 at 26–42; ECF No. 146-1 at 33–41. Both insurers also assert that, since the Town did not expend the $1 million retained limit until it paid the settlement—at which time the duty to defend was no longer at issue—they had no duty to defend against the underlying lawsuit. ECF No. 142-2 at 43–44; Starr Opp. to East Haven Mot. for Summ. J., ECF No. 149 at 26–30. Finally, Starr asserts that the Town's unexcused delay in notifying it of the *One Barberry* lawsuit discharges Starr from any of its obligations under the contract. ECF No. 149 at 39–42.

The Court holds that, because neither insurer breached a duty to indemnify or defend the Town in relation to the lawsuit, Defendants' summary judgment motions must be granted, and Plaintiff's must be denied.

B. Order of Analysis

The Court first evaluates whether the Town violated the notice precondition to coverage under the Starr policy. It then considers whether either insurer had a duty to indemnify the Town or defend it against the *One Barberry* lawsuit. This analysis will proceed first with the duty to indemnify, before turning to the duty to defend.

The "traditional rule" is that "the duty to defend follows the *possibility* of a duty to indemnify." *Allstate Ins. Co. v. Stearns*, No. 3:14-CV-1984 (SRU), 2016 WL 30653, at *6 n.7 (D. Conn. Jan. 4, 2016) (emphasis added); *see also City of W. Haven v. Com. Union Ins. Co.*, 894 F.2d 540, 545 (2d Cir. 1990) ("The duty to defend 'lasts until the stage of proceedings is reached when it is clear that no element of the subject matter of the suit is within the scope of the policy'"). Given that liability has already been established, there is little need to consider for present purposes whether there is a "possibility" of a duty to indemnify: the Court has the information it needs to resolve the indemnification question without resorting to likelihoods. The parties acknowledge that the duty to defend is largely moot, given that liability is already established. *See* ECF No. 144-1 at 22–23; Allied World Opp. to East Haven Mot. for Summ. J., ECF No. 147 at 9–10. However, the Town asserts that both insurers have breached the duty to defend, and posits that such breach is relevant to damages and the availability of policy exclusions. The Court thus considers it second. *See Ne. Utilities Serv. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:08-CV-01673 (CSH), 2012 WL 2872810, at *3–14 (D. Conn. July 12, 2012) (considering the duty to indemnify prior to the duty to defend, where the underlying parties had previously settled their lawsuit).

C. Starr Notice Conditions

First, the Court concludes that Starr is not discharged from liability on its policy by virtue of the Town's delay in notifying Starr of the suit.[6] While the Town's delay in notifying Starr was unexcused and unreasonable, Starr has not demonstrated that its rights under the policy were prejudiced by the delay.

Under Connecticut law, absent waiver, an unexcused, unreasonable delay by an insured in notification of a covered occurrence, which causes material prejudice to the insurer, "constitutes a failure of condition that entirely discharges an insurance carrier from any further liability on its insurance contract." *State Farm Fire & Cas. Co. v. Yoel*, No. 3:13-CV-101 (AWT), 2014 WL 4182614, *5 (D. Conn. Aug. 21, 2014) (quoting *Arrowood Indem. Co. v. King*, 605 F.3d 62, 77 (2d Cir. 2010)). The insurer must prove, by a preponderance of the evidence, that it is prejudiced by the insured's failure to comply with a notice provision, and an insured does not forfeit his coverage if no such prejudice is shown. *See id.* (quoting *Arrowood Indem. Co. v. King ("Arrowood II"),* 304 Conn. 179, 201 (2012)).

First, the Court holds that the Town failed to timely notify Starr of the *One Barberry* lawsuit. While the Town notified Allied World on June 24, 2017, that the underlying action had been filed, it did not formally notify Starr until February 25, 2020, more than two and a half years later. East Haven L.R. 56(a)2 St., ECF No. 148-1 ¶ 30 ("East Haven notified Allied World on June 24, 2017 that the Underlying Action (not then consolidated) had been filed and that the allegations in the Underlying Action implicated Allied World's obligations under the Allied World Policies"); East Haven Opp. to Starr Mot. for Summ. J., ECF No. 148 at 18 ("[F]ormal notice to

[6] To the extent Starr argues that it does not have a duty to indemnify or defend because the Town did not subjectively believe Starr had such a duty, that argument is unavailing, as the question is one of contractual interpretation, not subjective intent.

Starr was made during February, 2020”). This clearly violates the Starr policy condition requiring that the Town notify Starr “as soon as practicable” of an “occurrence” under the policy that may result in the filing of a “claim or suit” that may exceed 50% of the retained limit under the policy. ECF No. 146-6 at 26. Connecticut courts have construed “as soon as practicable” in this context to mean “as soon as can reasonably be expected under the circumstances.” *Silver v. Indem. Ins. Co. of N. Am.*, 137 Conn. 525, 528–29 (Conn. 1951).

The Town has not explained any circumstances that would have excused its delay in notifying Starr of the suit.[7] While the Town appears to contend that it did not become clear to the Town Attorney that the Underlying Plaintiffs’ claims would exceed 50% of the $1 million retained limit under the policy until February of 2020, *see* ECF No. 148 at 18–19, this argument is unreasonable, given that the operative complaint filed in 2017 sought damages in excess of $25 million—twenty-five times the retained limit. Even if the Town did not believe the complaint was fully meritorious or that the Underlying Plaintiffs were likely to obtain a judgment of that magnitude, it should reasonably have known that its liability could have exceeded $500,000, 50% of the retained limit under the Starr policy. An insured cannot close its eyes to potential liability to excuse notice requirements.[8] And delays significantly shorter in length than the Town’s have been deemed unreasonable. *See Greater New York Mut. Ins. Co. v. Robbins Eye Ctr. P.C.*, No. 3:19-CV-01741 (MPS), 2022 WL 867761, at *12 (D. Conn. Mar. 23, 2022) (collecting cases

[7] The Town has not argued that it held a good faith belief the Starr policy was not implicated at the time the lawsuit was originally filed, such that it would not have been “practicable” to notify Starr immediately. Under New York law, an insured’s good faith but mistaken belief that there is no coverage for a claim excuses late notice. *Simon Prop. Grp., L.P. v. Lumbermen’s Mut. Cas. Co*., 459 F. App’x 16, 18 (2d Cir. 2012) (“A good-faith belief by the insured that an incident does not trigger coverage under its insurance policy ‘may excuse or explain a seeming failure to give timely notice.’”). As the Town makes no similar argument under Connecticut law, the Court does not address this possibility.

[8] The Town relies on cases from other jurisdictions pertaining to excess liability coverage where delayed notice was permitted. *See* ECF No. 148 at 18–19. These cases, of course, are not binding on the Court.

finding that ten and sixteen month delays rendered notice untimely). Accordingly, the Town's failure to notify Starr was unexcused and unreasonable.

But Starr has not demonstrated by a preponderance of the evidence that it was prejudiced by this delay, as required by Connecticut law. Starr was notified when the litigation was in the beginning stages of discovery, before depositions had been taken or dispositive motions had been filed. *See* ECF No. 149-1 ¶ 28; May 2020 Letter, ECF No. 145-13 at 1 (letter from Town Attorney to Starr describing procedural posture of underlying case as of that date); Case No. 17-CV-985 (KAD), ECF No. 66 (setting dispositive motions deadline for June 1, 2020); *id.*, ECF Nos. 74, 87, 91, 96, 98 (extending discovery deadlines ultimately to October 28, 2020, and dispositive motions deadline to December 7, 2020).

Starr contends that it was not notified of the Underlying Action until after the deadline for motions to dismiss had passed and discovery was underway, prejudicing its ability to settle the action early, contest the damages being allowed, or investigate the allegations. ECF No. 146-1 at 43. However, as discussed further below with respect to the duty to defend, Starr's right and duty to participate in the Town's defense was not implicated until the Town exhausted its $1,000,000 "retained limit" under the terms of the policy. *See* ECF No. 146-6 at 6 ("We will have the right and duty to defend the insured . . . when the retained limit has been exhausted."). The parties do not dispute that, as of February 2020, the retained limit had not been exhausted. Starr took the position that its coverage was not implicated as of that date, and did not investigate, attempt to settle the case, or otherwise defend the Town. *See* Broker Dep., ECF No. 145-10 at 34–35 (deposition of Starr representative, noting that Starr had no duty to defend the Town as of February 24, 2020, because the retained limit had not been reached) Thus, Starr likewise had no *right* to defend the lawsuit, and has not carried its burden of demonstrating how it was prejudiced by the

Town's failure to notify it earlier than February of 2020. As a result, its obligations under its policy are not discharged simply by virtue of the untimeliness of the Town's notice and request for defense and indemnity.

D. Duty to Indemnify

The Court next concludes that neither insurer owed the Town a duty to indemnify it for losses sustained in connection with the underlying litigation.

Whether the insurers owe duties to indemnify the Town depends on two factors: first, when the relevant "wrongful acts" or "occurrence" took place, and second, whether any policy exclusions are applicable in this case. Given that both insurance policies provide coverage for "wrongful acts" within their policy periods, the determination of each Defendant's duties first depends on whether the wrongful acts commenced in the Starr policy period (July 1, 2015, to July 1, 2016) or Allied World policy period (July 1, 2016, to July 1, 2021). The Court concludes that Starr has no duty to indemnify the Town because the relevant wrongful acts occurred after the end of its policy period. The wrongful acts occurred during the Allied World policy period. But turning to the next step of the analysis, the Court concludes that Allied World has no duty to indemnify the Town because a policy exclusion precludes coverage for the liability at issue. Accordingly, neither insurer breached any duty to indemnify the Town for the settlement amount.

*1. Legal Standard*

The duty to indemnify "depends upon the facts established at trial and the theory under which judgment is actually entered in the case." *DaCruz v. State Farm Fire & Cas. Co.*, 268 Conn. 675, 688 (2004) (citation omitted). Thus, the duty to indemnify "arises only if the evidence adduced at trial establishes that the conduct *actually* was covered by the policy." *Id*. (emphasis in original).

*2. Date of Relevant "Occurrence" or "Wrongful Act"*

Both the Starr and Allied World policies offer coverage for liability arising out of public officials' wrongful acts during the relevant policy period. And both insurers' indemnification obligations extend to liabilities arising out of actions that *began* during the policy period—even if the wrongful acts continued after the policy period's end. Thus, if the relevant acts leading to the defendants' liability began between July 1, 2015, and July 1, 2016, the Starr policy is implicated, and if the relevant acts began between July 1, 2016, and July 1, 2021, the Allied World policies are implicated.

The insurance policies use similar language in defining their duties to indemnify the Town. Allied World agreed to indemnify the Town for losses from "occurrences" resulting in "wrongful acts," while Starr agreed to indemnify the Town for losses arising out of "wrongful acts." ECF No. 142-14 at 121; ECF No. 146-6 at 5. The policies likewise apply similar principles in determining whether an act took place during its policy period: Allied World's policy defines an "occurrence" as taking place on the date of the first "act," and Starr's policy considers a "wrongful act" to take place on the date of the first "related wrongful act." ECF No. 142-14 at 121; ECF No. 146-6 at 10. For the purposes of determining which insurer, if either, is obligated to indemnify the Town, the Court evaluates which subset of Maturo, Soto, and the Town's actions precipitated its liability for the substantive due process violation, and finds the Town's liability for substantive due process violations was predicated on wrongful acts taking place in 2017.

a. Liability in *One Barberry*

In *One Barberry*, the Court found that the Underlying Plaintiffs held a valid property interest that was infringed by the underlying defendants "in an arbitrary or irrational manner," causing a violation of the underlying plaintiffs' substantive due process rights. *One Barberry*, 698 F. Supp. 3d at 313–18. It thus concluded that three underlying defendants—Maturo, Soto, and

the Town—were liable for substantive due process violations against the underlying plaintiffs. It found the Underlying Plaintiffs' Takings Clause and inverse condemnation claims to be moot and did not reach their municipal estoppel claim. *Id.* at 329. It also found that another underlying defendant, Milici, was not liable for maliciously slandering the underlying plaintiffs' title. *Id.* at 333–34. Thus, the defendants' liability rested on the trial court's determination of only the substantive due process claim.

In its ruling, the Court set out a detailed timeline of the evidence presented at trial, *see id.* at 266–311, but the vast majority of the relevant events—and certainly those that supported liability on the substantive due process claim—occurred in 2017, not earlier. In reaching its holding, the Court clearly identified the decision to "issue the third cease-and-desist order shutting down the quarry" on May 9, 2017, as the action directly causing the constitutional violation and precipitating the Town's liability. *Id.* at 289, 314. In evaluating each of the individual defendants' liability, the Court defined the relevant activity as issuing or upholding the cease-and-desist order that caused the shutdown of the quarry. *See id.* at 314–18 (finding Soto lacked authority to issue the third cease-and-desist, failed to follow the proper procedure in doing so, and used pretextual explanations for issuing the cease-and-desist order); *id.* at 318 (finding Maturo's decision "for Soto to proceed with the third cease-and-desist order" was motivated by his political aspirations in the 2017 election, which constituted "impermissible political animus"); *id.* at 319 ("both Maturo and Soto directly and intentionally participated in shutting down the quarry in violation of Plaintiffs' substantive due process rights"); *id.* ("Soto's and Maturo's actions were proximate causes of the violation of Plaintiffs' substantive due process rights," because the Underlying Plaintiffs' injury "was directly caused by Soto issuing the third cease-and-desist order").

Likewise, in its analysis of the § 1983 municipal liability claim,[9] the Court clearly treated the shutdown of the quarry as the relevant constitutional deprivation, and the decision to issue a third cease-and-desist order as the wrongful act that caused such shutdown. *See id.* at 327–28 (concluding that the ZBA's "ratification" of Maturo's and Soto's conduct "caused the deprivation of Plaintiffs' substantive due process rights in violation of the Fourteenth Amendment" because it was "one of three proximate causes of the sustained shutdown of the quarry"). Finally, the Court's damages analysis also supports that the constitutional violation began after the third cease-and-desist order was issued. *Id.* at 340–368 ("forecast[ing] what FRR's profits would have been but for Defendant's conduct" beginning the day after the ZBA meeting approving the third cease-and-desist, on May 10, 2017).

While the Court described some evidence in the ruling suggesting that Maturo had interfered with the quarry's ability to obtain blasting permits in the leadup to the fall 2015 election for political reasons, *see id.* at 273–75, these events do not constitute a wrongful act that would have triggered coverage under the Starr policy. *See* ECF No. 146-6 at 17–18 (defining "wrongful act" is "[a]ny actual or alleged error or misstatement, omission, negligent act, or breach of duty including misfeasance, malfeasance, and nonfeasance"). Instead, these events constituted circumstantial evidence supporting the Court's conclusion that Maturo committed a substantive due process violation in May of 2017, based on his long-held resistance to continued operation of

[9] The Town's liability was evaluated pursuant to the standard set forth in *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978) and as interpreted by the Second Circuit, which dictates that a plaintiff must prove "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *One Barberry*, 698 F. Supp. 3d at 326 (citing *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). As Maturo and Soto were town officials sued in their individual capacities, the Court evaluated whether they were liable for substantive due process violations pursuant to the requirements of 42 U.S.C. § 1983. *Id.* at 312 ("Section 1983 'provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law' . . . Plaintiffs must also show (1) that each Defendant was personally involved in the deprivation of substantive due process . . . and (2) that each Defendant's actions were a proximate cause of the deprivation of substantive due process") (citations omitted).

the quarry for political reasons. *See One Barberry*, 698 F. Supp. 3d at 328 (describing Maturo's interference with blasting permits as "corroborat[ing]" evidence that the decision to shut down the quarry was "motivated by . . . political pressure" and an "example of Maturo influencing the actions of the other Town officials with respect to the quarry"). Farm River Rock's 2016 tax appeal was likewise not relevant to the finding of liability. It was solely considered with respect to a claim of malicious slander of title, for which no defendants were found liable. *Id.* at 330–34.

Thus, there was no "occurrence" within Starr's policy period, and its policy is not implicated here. Accordingly, the Court does not reach Starr's other arguments for barring coverage, such as the applicability of the policy's exclusions.

b. Allied World's Duty to Indemnify

Because the Court imposed liability for the issuance of the third cease-and-desist order on May 9, 2017, Allied World's duty to indemnify is implicated, as its coverage began on July 1, 2016.

The Town's arbitrary deprivation of the Underlying Plaintiffs' property rights through the issuance of the third cease-and-desist order was a "wrongful act," as defined under the Allied World policies. Under the Allied World policy, a "public official's wrongful act" is defined in part as "any actual or alleged . . . [e]rror or omission, neglect or breach of duty by an insured; [or] [v]iolation of civil rights protected under 42 U.S.C. 1981 *et sequential*." ECF No. 142-14 at 140. In *One Barberry*, the Court held that the shutdown of the quarry violated the Underlying Plaintiffs' civil rights under 42 U.S.C. § 1983, which is included in the definition of "wrongful act" in the Allied World policies by reference to "§ 1981 *et seq*." *See*, *e.g.*, *Burnett v. Grattan*, 468 U.S. 42, 43–44 (1984), *holding modified by Wilson v. Garcia*, 471 U.S. 261 (1985) (referring to the "Reconstruction–Era Civil Rights Acts, 42 U.S.C. § 1981 *et seq*" when discussing Sections 1981, 1983, 1985, and 1986). Because the shutdown was a violation of the Underlying Plaintiffs' civil

rights protected under Section 1983, it constitutes a "wrongful act" under the Allied World policies.

The fact that Allied World's policies condition indemnification on the time of an "occurrence" *resulting in a wrongful act* does not bring the constitutional violation outside of coverage. The *One Barberry* holding makes clear that the relevant "occurrence" was the decision at the May 9, 2017, Code Enforcement Committee meeting to issue the third cease-and-desist that shut down the quarry. *One Barberry*, 698 F. Supp. 3d at 314–19. Contrary to Allied World's description of *One Barberry*, the Court did not treat the relevant events as an overarching "part of [an] ongoing scheme by the Town to shut down the Quarry" beginning prior to 2017. *Cf.* ECF No. 142-2 at 34. It did not arrive at findings of fact or conclusions of law supporting a finding that the events in 2015 or 2016 were part of "substantially the same generally harmful conditions" as those that led to the shutdown of the quarry in 2017. *Cf.* ECF No. 142-14 at 121, 139 (defining an "occurrence" as "an event, including continuous or repeated exposure to substantially the same generally harmful conditions," that takes place "on the date of the first event, act, error, or omission").[10] Rather, to the extent the events of 2015 and 2016 (Maturo's interference with the blasting permits and the quarry's tax appeal) were "harmful conditions" imposed upon the Underlying Plaintiffs, they were meaningfully different from the harmful conditions caused by the cease-and-desist order mandating that the quarry cease operations. Courts interpreting similar definitions of the term "occurrence" are careful not to group dissimilar wrongful acts into one

[10] The actions of the underlying defendants throughout early 2017 could potentially be considered as part of the same "occurrence" under the policy, to the extent the first and second cease-and-desists were intended to limit or eliminate the quarry's operations, and thus constitute "continuous [and] repeated exposure to substantially the same generally harmful conditions." *Id.* at 289 ("The Court infers that Soto believed the continuation of any drilling or blasting would violate the first and second cease-and-desist orders, even though those orders did not specifically forbid drilling and blasting, because such activities would necessarily disturb the soil on the property, as had the clear-cutting of trees and removal of stumps."). However, the Court did not make a finding about the connection between the three cease-and-desist orders—and, regardless, the first and second cease-and-desist orders were issued during the Allied World policy period, rendering such a distinction moot.

occurrence. *See Travelers Indem. Co. v. Northrop Grumman Corp.*, 413 F. Supp. 3d 263, 275 (S.D.N.Y. 2019) (finding incidents of "groundwater contamination" and "soil contamination" caused by Defendant's industrial waste were "separate occurrences," even though both "trace[d] back to [Defendant's] industrial waste disposals," because they "resulted from distinct courses of events that injured victims and property through distinct channels."); *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 255 Conn. 295, 304–05 (2001) (finding that an "alleged failure to publicize adequately the dangers of asbestos exposure, which began at some point in the 1930s and continues to the present time," did not constitute a single occurrence, and each claimant's exposure to asbestos was a separate occurrence).

Had the Court determined that the underlying defendants' liability arose out of a pattern or broader scheme of substantive due process violations targeting the quarry beginning prior to 2017, it would have included such a determination—and reasoning supporting it—in its lengthy discussion of liability, and would have used a different methodology to evaluate the relevant damages. The Court will thus not construe earlier events as being part of the same "occurrence" as the decision to issue the third cease-and-desist order.[11]

In sum, because liability was founded upon actions taken during the Allied World policy period, Allied World's duty to indemnify is implicated, while Starr's is not.

---

[11] For the same reasons, there is no basis to conclude that the Town was aware of "wrongful act[s]" prior to the Allied World policy period, rendering coverage unavailable under the "prior knowledge" condition. *See* ECF No. 142-2 at 40 (citing ECF No. 142-14 at 121) ("Our obligation under this insuring agreement only applies if . . . [p]rior to the 'policy period,' no insured knew or had reason to know that the 'public official's wrongful act' had occurred, in whole or in part"). While the Town was aware of its own actions prior to 2017, including the interference with blasting permits in 2015 and the denial of a manufacturing tax exemption in 2016, such actions are not part of "*the* 'public official's wrongful act'" for which liability was imposed. Because this provision imposes a condition on Allied World's obligation to pay "'loss' from an 'occurrence,'" *see id.*, the Court reads the provision as encompassing only wrongful acts in relation to which "loss" has arisen. The provision thus cannot operate to bar coverage for the substantive due process violation for which damages were awarded to the Underlying Plaintiffs, regardless of whether the Town might have reasonably expected a claim or lawsuit to result from the acts at issue.

*3. Allied World Policy Exclusions*

The Court thus turns to the question of whether exclusions in Allied World's policies bar coverage, and concludes that exclusion for claims resulting from the "lack of due process" (Exclusion 10) bars coverage for the loss associated with the *One Barberry* judgment and subsequent settlement.

"It is well settled that 'exclusions from insurance policy coverage are given strict construction.'" *Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 447 (D. Conn. 2010) (quoting *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.,* 19 F.3d 78, 81 (2d Cir.1994). To that end, "[p]olicy exclusions are interpreted in a manner most beneficial to the insured." *Id.* (citing *MH Lipiner & Son, Inc. v. Hanover Ins. Co.,* 869 F.2d 685, 687 (2d Cir. 1989)). Any "'ambiguous words or phrases in an insurance policy are construed strictly against the insurance company and in favor of coverage,'" such that "'[t]he test of coverage is not what the insurer intended to cover but what a reasonable person in the position of the insured would understand to be covered.'" *Id.* (quoting *Clinton v. Aetna Life & Sur. Co.,* 41 Conn. Supp. 560, 563 (Conn. Super. Ct. 1991)). "[T]he insurer has the burden of proving that the claim for which coverage is sought falls within a policy's exclusion." *Lancia v. State Nat'l Ins. Co.*, 134 Conn. App. 682, 690 (2012).

As an initial matter, and as discussed further below, because Allied World did not breach any duty to defend, it is not precluded from asserting its policy exclusions with respect to the duty to indemnify. *Cf. Capstone Bldg. Corp. v. American Motorists Ins. Co*., 308 Conn. 760, 806 (2013) ("If the insurer declines to provide its insured with a defense and is subsequently found to have breached its duty to do so, it bears the consequences of its decision, including the payment of any reasonable settlement agreed to by the plaintiff and the insured."). Allied World also did not waive any of its exclusions by failing to mention them in its denial letters; the letters indicate that the insurer reserved its rights to assert exclusions, including those not explicitly invoked. *See* Oct.

2017 Letter, ECF No. 142-25 ("[T]his letter is not intended to provide an exhaustive review of all Policy terms, conditions and exclusions and Allied World expressly reserves its right to rely upon and enforce additional Policy terms when appropriate"); July 2020 Letter, ECF No. 142-26 (same); August 2020 Letter, ECF No. 142-27 (same). Thus, the Court evaluates the applicability of each of Allied World's asserted policy exclusions.

A plain reading of Exclusion 10, titled "Eminent Domain or Inverse Condemnation," demonstrates that it squarely bars coverage for the type of liability at issue. This provision forecloses coverage for suits "arising out of or resulting from *deprivation, destruction or controlling of property* by any means, method or proceeding that involves or is any way related to the principles of eminent domain, inverse condemnation, adverse possession, right of prescription, dedication by adverse use, *lack of due process,* or by whatever name used or however characterized; or the resulting diminution of property value." ECF No. 142-14 at 124 (emphases added). The Court clearly determined in *One Barberry* that the Underlying Plaintiffs suffered losses resulting from the "deprivation" or "controlling" of their property by means involving "lack of due process" and the "resulting diminution of property value." *One Barberry*, 698 F. Supp. 3d at 311 ("[T]he Court finds Maturo, Soto, and the Town infringed on Plaintiffs' constitutionally protected property right in an arbitrary and irrational manner, in violation of the Fourteenth Amendment's substantive due process protections"); *id.* at 334 ("Because Plaintiffs have prevailed on their § 1983 claims against Soto, Maturo, and the Town, the Court must determine the compensatory damages to which they are owed.").

This plain reading of Exclusion 10 does not eviscerate the Allied World policies' coverage for civil rights violations or render the coverage illusory. The policy is clearly intended to cover claims forming the basis of liability under the Civil Rights Acts, including 42 U.S.C. § 1983. But

excluding claims for "lack of due process" in the context of property deprivation does not preclude coverage for all, or even the vast majority of, civil rights claims. Reading the policy as a whole, "[i]t appears that the parties bargained for coverage for certain claims of civil rights violations . . . and not for others." *Town of Springfield, Vt. v. U.S. Fid. & Guar. Co.*, 794 F.2d 802, 806 (2d Cir. 1986) (refusing to "rewrite" an exclusion "expressly agreed to by the parties" in order to ensure all Civil Rights Act violations were covered by insurance policy, where other civil rights violations, such as "assault against a person in the course of his arrest," were not encompassed by the relevant exclusion). That the Town may, in retrospect, wish the exclusion contained different language does not mean that a reasonable person in the Town's position would have understood the policy to cover property deprivations premised on a lack of due process—the exact conduct in which the underlying defendants were found to have engaged.

The Town's argument that this exclusion is ambiguous and should be construed only to encompass a "takings claim" is also unavailing. Despite the reference in the caption of Exclusion 10 to "eminent domain and inverse condemnation," the text of the entire exclusion makes clear that it applies to violations beyond those relating strictly to those types of property deprivation. *See Town of Wallingford v. Hartford Acc. And Indem. Co*., 231 Conn. 301, 305 n.4 (1994) ("An insured is not entitled to read only the heading and ignore the operative language of the provision itself; indeed, the brevity of the heading indicates that the insured should read further to learn the actual coverage specifications."). The exclusion as a whole contains intentionally expansive language, covering methods including "adverse possession, right of prescription, dedication by adverse use, lack of due process, *or by whatever name used or however characterized*." ECF No. 142-14 at 124. There is no conflict between the caption and the subsequent text. *See Mazzaferro v. RLI Ins. Co.*, 50 F.3d 137, 140 (2d Cir. 1995) ("A contract of insurance must be read as a whole,

including any introductory clause or heading, to determine the intent of the parties . . . Every provision is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it") (internal quotations and citations omitted).

The Court "cannot disregard the plain meaning of the policy's language . . . in order to find an ambiguity where none exists." *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 119 (2d Cir. 2011) (internal quotations and citation omitted). The Town cites no authority in support of its position that an exclusion that does not contain the word "taking" should be construed only to cover Takings Clause claims.[12] *Cf.* East Haven Opp. to Allied World Mot. for Summ. J., ECF No. 150 at 21. Nor does the fact that the exclusion fails to distinguish between substantive due process claims and procedural due process claims or specifically reference Section 1983 make it ambiguous. To a reasonable person in the position of the insured, a plain reading of the exclusion encompasses the liability in *One Barberry*. Accordingly, Exclusion 10 bars coverage for the Town's losses, which were based on a lack of due process. Allied World therefore has no duty to indemnify the Town.

On the other hand, neither Exclusion 13, titled "Fraudulent or Dishonest Acts," nor Exclusion 25, titled "Prior Notice; Pending or Prior Legal Action," independently operate to bar coverage. ECF No. 142-14 at 125–27. First, the Court's judgment in *One Barberry* did not make any findings that acts of "active or deliberate fraud or dishonesty" were relevant to its

[12] Further, at the summary judgment stage, Judge Dooley stated that the Takings Clause claim and the substantive due process claim were "alternative theories of liability," and stated that "Plaintiffs may not prevail on both a substantive due process claim and Takings Clause claim," *One Barberry Summ. J.*, 2021 WL 4430599, at *16. Similarly, the trial court indicated that such claims were mutually exclusive, because the core harm was the same for both claims. *One Barberry*, 698 F. Supp. 3d at 329. Thus, even if the Town were to argue that the exclusion should be construed as applying only to a particular subset of due process claims that "sound like" takings claims, the exclusion would still bar coverage.

determination of liability, nor did it suggest as much. The Court found that Maturo and Soto acted "selfish[ly]," such that their conduct was "constitutionally unacceptable," but that it did not include a "positive element of conscious wrongdoing" or the "evince the sort of malicious or callous indifference that would justify a punitive damages award." 698 F. Supp. 3d at 370. Likewise, the Court did not make any findings that the underlying defendants acted maliciously, dishonestly, or fraudulently in the commission of constitutional violations. Indeed, the Court found the Town was not liable for the slander of title claim *because* the underlying plaintiffs had failed to show malice. *Id.* at 333–34. In the absence of a specific definition within the policy of "bad faith" or "active or deliberate fraud," *see* ECF No. 142-14 at 125, and in light of its obligation to construe policy language in a manner favorable to the insured, the Court declines to read those terms as encompassing behavior for which punitive damages would not be awarded. The Court thus cannot find that bad faith, fraud, or dishonesty was "material to the cause of action so adjudicated," as would be required for Exclusion 13 to apply. *See id.*

Second, as to Exclusion 25, the Court did not make findings that the *One Barberry* lawsuit arose out of or was "related" to any prior legal or administrative proceedings, such that the exclusion for a prior or pending legal action would bar coverage. Allied World posits that Farm River Rock's tax appeal in May of 2016 of East Haven's October 2015 personal property tax assessment in Farm River Rock's machinery and equipment is a "prior legal action" that bars coverage for the *One Barberry* losses. But the Court's finding of liability on the substantive due process claim was not premised on, or even "related to," the 2016 tax appeal. As discussed above, the tax appeal was solely relevant to the claim of slander of title, for which no liability was found. 698 F. Supp. 3d at 333–34. Exclusion 25 therefore does not apply.

Regardless, however, because Exclusion 10 applies to bar coverage under the Allied World policies, Allied World has no duty to indemnify the Town with respect to the settlement.

E. Duty to Defend

Finally, the Town posits that the duty to defend analysis is "largely moot," but that it is relevant "as it relates to damages." ECF No. 144-1 at 23; ECF No. 145-1 at 22. Specifically, the Town does not seek reimbursement of the out-of-pocket fees and costs paid in defense of the *One Barberry* matter, but it argues that the duty to defend "may be relevant" to the "availability of coverage for prejudgment interest and interest accruing after judgment." ECF No. 144-1 at 23; ECF No. 145-1 at 22. When "the duty to defend exists," the Allied World policies obligate the insurer to pay "interest on the entire amount of any judgment, which does not exceed the limit of our liability." ECF No. 142-14 at 122. The Starr policy contains a similar provision obligating it to pay "[p]rejudgment interest awarded . . . [and] [i]nterest on the amount of any judgment that accrues after the entry of judgment and before we have paid . . ." ECF No. 146-6 at 7. Accordingly, the Court evaluates the parties' arguments regarding the duty to defend. It finds that no such duty was breached by either insurer.

*1. Legal Standard*

As previously discussed, the duty to defend "follows the *possibility* of a duty to indemnify." *Allstate Ins. Co.*, 2016 WL 30653, at *6 n.7 (emphasis added). Accordingly, in the ordinary course, "[u]nder Connecticut law, it is well established that a liability insurer has a duty to defend its insured if the pleadings" against the insured "allege a covered occurrence." *Ryan v. Nat'l Union Fire Ins. Co.*, 692 F.3d 162, 167 (2d Cir. 2012) (citation omitted, cleaned up); *Misiti, LLC v. Travelers Prop. Cas. Co. of Am.*, 308 Conn. 146, 155-56 (2013). "In determining whether a claim falls within the scope of an insurance policy, the Supreme Court of Connecticut 'construes broad policy language in favor of imposing a duty to defend on the insurer,' and 'requires a defense if an

allegation of the complaint falls even possibly within the coverage.'" *Ryan*, 692 F.3d at 167 (internal quotation marks and citation omitted).

*2. Discussion*

The Court finds that neither insurer breached any contractual duty to defend the Town in the underlying lawsuit because the Town did not incur eligible expenses in excess of the retained limit of either policy until it made the settlement payment to Farm River Rock—at which time there was no claim or suit left to defend.

As described above, Allied World agreed to "defend the insured against any 'claim' or 'suit' seeking 'loss' for a 'public official's wrongful act' to which this insurance applies, only when the 'retained limit' has been exhausted because of judgments, settlements and 'loss adjustment expenses' paid by the insured to a third party," up to the policy limits. ECF No. 142-14 at 122. Similarly, Starr agreed to "have the right and duty to defend the insured against any claim or suit . . . to which this insurance applies when the retained limit has been exhausted by payment to a third party of judgments, settlements or defense costs." ECF No. 146-6 at 6.

The operative complaints in the underlying action contain allegations that implicate both the Starr policy period and the Allied World policy period.[13] The Underlying Plaintiffs framed their case as a civil conspiracy to violate a litany of the Underlying Plaintiffs' rights, and alleged causes of action to match. The complaints allege activity taking place before and after July 1, 2016, upon which liability could have been found, such that it was possible either or both of the insurance policies would have been implicated. *See* Sec. Am. Compl., ECF No. 142-8 ¶¶ 24, 34, 47, 58 (alleging the existence of a conspiracy beginning before 2016); *see also One Barberry*

[13] The parties appear to agree that the Second Amended Complaints filed by the Underlying Plaintiffs are the relevant documents for the purposes of the substantive duty to defend analysis, though Starr also discusses the First Amended Complaints. *See* ECF Nos. 142-7, 142-8 (attaching the Second Amended Complaints as exhibits); ECF No. 144-2 ¶ 20 (referring to the Second Amended Complaints as the "operative complaints"); ECF No. 146-1 at 33.

Summ. J., 2021 WL 4430599, at *2–7 (describing factual developments before and after July 1, 2016). It is thus a reasonable construction of the underlying complaints that they asserted claims based on wrongful conduct during both policy periods.

But it is undisputed that the Town did not meet its $1,000,000 retained limit threshold, as required to trigger the duty to defend under either the Allied World policies or the Starr policy, before the Court issued its order and judgment after trial in October of 2023. *See*, *e.g.*, ECF No. 145-1 at 22 ("The Defense Costs incurred by the Town ultimately were less than the retention"). Both insurance policies required the "retained limit" to have been actually paid to a third party for the duty to defend to arise. ECF No. 142-14 at 122 ("retained limit" is "exhausted" through "judgments, settlements and 'loss adjustment expenses' *paid* by the insured to a third party") (emphasis added); ECF No. 146-6 at 6 ("retained limit" "exhausted by *payment* to a third party of judgments, settlements or defense costs"). These provisions placed an obligation upon the Town to self-insure up to $1,000,000 in judgments, settlements, defense costs, or "loss adjustment expenses." *See* ECF No. 142-14 at 140 (describing the "retained limit" as "self-insurance"); ECF No. 146-6 at 17 (describing the "retained limit" as a "self-insured retention"). And, in this case, such expenses exceeding $1,000,000 were not paid until the Town satisfied its settlement agreement with the Underlying Plaintiffs, on February 25, 2025.

And by the time the retained limit was exhausted via the Town's satisfaction of its obligations under the settlement agreement, two sets of circumstances extinguished the duty to defend. First, the scope of liability had been decided through the bench trial ruling, which meant that Starr's policy was not implicated (for the reasons explained above) and that Allied World's Exclusion 10 barred coverage under its policies. *See City of W. Haven*, 894 F.2d at 545; *Yuzvik v. United States Liab. Ins. Co.*, No. 3:21-CV-1170 (JAM), 2022 WL 1605539, at *2 (D. Conn. May

20, 2022) ("There is no duty to defend . . . when coverage of the claim is expressly foreclosed by an unambiguous policy exclusion."). Second, when the duty to defend arose after payment of an amount exceeding the retention, there was no claim or suit left to defend. While the duty to defend "ordinarily continues through prosecution of appeals," *see City of W. Haven*, 894 F.2d at 545, the terms of the settlement in this case included a withdrawal of the Town's appeal. For these reasons, because the insurers' duties to defend would only have come into existence "when the [r]etained [l]imit was exhausted," the duties ceased to exist at the same time they might have arisen. *Ne. Utilities Serv. Co.*, 2012 WL 2872810, at *13.

There are no grounds to depart from the terms of the parties' agreement here. *See Stetzer v. Dunkin' Donuts, Inc.,* 87 F. Supp. 2d 104, 110 (D. Conn. 2000) ("Where the terms of an agreement are unambiguous, the parties are bound by the plain terms of their contract and their subjective intents are immaterial."). As an initial matter, this type of prerequisite to the duty to defend is not barred by considerations outside the four corners of the agreement. The requirement that a retained limit be exhausted before a duty to defend is triggered is "not impermissible under Connecticut law." *See Ne. Utilities Serv. Co.*, 2012 WL 2872810, at *13 (finding no duty to defend where $1 million retained limit was unexhausted). Had the Town sought to further limit its obligations to self-insure, it could have included such a provision when negotiating its agreements with its insurers.

Second, the Court will not deem the retained limit exhausted, or construe the terms "paid" or "payment" in the policies to mean "payable." The Town argues for the first time in reply to Allied World and Starr that requiring the retained limit to be actually "paid" to a third party renders coverage illusory. *See* East Haven Reply In Supp. of Mot. for Summ. J. Against Allied World, ECF No. 153 at 8; East Haven Reply In Supp. of Mot. for Summ. J. Against Starr, ECF No. 154

at 7. Both policies permit the retained limit to be exhausted through defense costs, judgments, and settlements. The Town suggests that giving effect to the retained limit provisions as written would mean that the insurers' duties to defend could *never* arise where the retained limit is exhausted via judgment or settlement, thus rendering the duty to defend meaningless. Even setting aside the obvious scenario in which defense costs or other "loss adjustment expenses" exceeding the retained limit are paid prior to the resolution of a given suit, this argument ignores the possibility that a partial judgment or settlement may resolve only some claims in a suit, leaving additional litigation expenses relating to the remainder of the claims. Accordingly, the Court cannot find that this provision is illusory. *See Karas v. Liberty Ins. Corp.*, 335 Conn. 62, 106 (2019) (recognizing that unless policy language "eliminates coverage altogether, it does not render the coverage illusory").

The Town further argues that the Court should deem the retained limit exhausted at an earlier date in the litigation because the judgment sought against it was one that Allied World and Starr would, to a reasonable certainty, have to pay. There is no basis in Connecticut law for such a conclusion. While a court in this District once found that an excess insurer's duty to defend arises where there is a "reasonable possibility" that its coverage may be reached, it also indicated that the conclusion was consistent with the applicable policy language before it—which is not the case here. *Cambridge Mut. Fire Ins. Co. v. Ketchum*, No. 3:11-CV-00743 (VLB), 2012 WL 3544885, at *6 (D. Conn. Aug. 16, 2012). In *Ketchum*, the court recognized that "a majority of states to have addressed the issue have held that the excess carrier's duty to defend is not triggered until the policy limit of the primary carrier is exhausted by settlement or tender of payment, even if the claim for damages in the underlying action exceeds the primary carrier's limit and the excess carrier's policy will necessarily be implicated in the action." *Id.* at *5. Nonetheless, the court

adopted the minority view, finding such an approach to be consistent with the policy language at issue: the excess insurer had agreed to provide coverage for an "occurrence if 'not covered by any primary insurance,'" and the court determined that the majority of the claim was not covered by primary insurance. *Id.* at *6. The Allied World and Starr policies impose no similar obligation on the insurers with respect to the Town's exhaustion of the retained limit; indeed, their language suggests the opposite. *See* ECF No. 142-14 at 122 (Allied World policy: "The *insured shall pay* all 'loss adjustment expenses' that relates to the defense of 'claims' or 'suits' which amounts are within the 'retained limit'". . . ) (emphasis added); ECF No. 146-6 at 5 (Starr policy: "We will pay on your behalf those sums in excess of the retained limit . . . "). And in any event, *Ketchum* does not involve a self-insured retention, so it is inapposite.

Additionally, neither Connecticut nor the Second Circuit have endorsed a rule similar to that applied by the Third Circuit when it found under New Jersey law that an insurer's "obligation [to defend] arose when it was confronted with the demand which put its coverage at stake." *Cooper Labs, Inc. v. Int'l Surplus Lines Ins. Co.*, 802 F.2d 667, 676 (3d Cir. 1986). Indeed, Connecticut law counsels against the application of such a rule. *See R.T. Vanderbilt Co. v. Hartford Accident & Indem. Co.*, No. X-02-UWY-CV-075016321, 2014 WL 1647133, at *5–6 (Conn. Super. Ct. Mar. 28, 2014) (reviewing "a series of cases whose outcomes were strictly limited to the policy language of those cases" to find that the policies at issue did not impose a duty to defend beyond an unexhausted retained limit), *aff'd,* 171 Conn. App. 61 (2017), *aff'd,* 333 Conn. 343 (2019); *Ne. Utilities Serv. Co.*, 2012 WL 2872810, at *13 ("[N]o Connecticut court has held that an excess carrier has a duty to defend regardless of policy language"). Thus, the Court will not contravene the express terms of these unambiguous policies.

Finally, even if the Court somehow found that either insurer's duty to defend *did* arise, Plaintiffs have not demonstrated either insurer has breached that duty. Plaintiffs have not established that any defense costs were incurred after the exhaustion of the retained limit, or that, after exhaustion, they asked either insurer to provide a defense. *See id*; *see* ECF No. 144-2 ¶¶ 25, 27–28 (Allied World disclaimed coverage on October 4, 2017, July 23, 2020, August 21, 2020, September 14, 2020, June 3, 2021, and October 10, 2023, and Starr disclaimed coverage on February 24, 2020, July 20, 2020, August 21, 2020, June 23, 2021 and October 20, 2023).

## IV. CONCLUSION

For the reasons described herein, Defendants Allied World and Starr had no duty to defend or indemnify the Town, and thus could not have breached such duties. Defendant Allied World's motion for summary judgment, ECF No. 142, is GRANTED, and Defendant Starr's motion for summary judgment, ECF No. 146, is GRANTED. Defendant Town of East Haven's motions for summary judgment, ECF Nos. 144 and 145, are DENIED. The Clerk is directed to enter judgment in favor of Defendants and close this case.

**SO ORDERED** at Hartford, Connecticut, this 25th day of September, 2026.

*/s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE